**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL WALSH, on behalf of himself and all others similarly situated, | Case No. 26-cv-05191 |
| Plaintiff, | <u>CLASS ACTION</u> |
| v. | **CLASS ACTION COMPLAINT** |
| PEPSICO, INC. and THE GATORADE COMPANY, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

**TABLE OF CONTENTS**

NATURE OF THE ACTION ....................................................................................................1

PARTIES ................................................................................................................................6

JURISDICTION AND VENUE ..............................................................................................7

FACTUAL ALLEGATIONS ..................................................................................................8

I.     Defendants' False and Misleading Statements ...............................................................8

       A)    LS Gatorade Products Contain False and Misleading Labels.................................8

             i)     "No Artificial" Claims on Social Media and Other
                    Advertising...................................................................................10

             ii)    "No Artificial" Promotion and Sale on Third Party Retail
                    Platforms. ...................................................................................12

             iii)   Defendants' Misleading Claims on Its Own Website and
                    Advertising...................................................................................14

       B)    Gatorade Powder Products Contain False and Misleading Claims on their
             Labels.............................................................................................................14

       C)    Gatorade Zero Products Contain False and Misleading Labels............................17

       D)    Classic Gatorade Products Contain False and Misleading Labels........................19

       E)    The Citric Acid in the Four Products Is Not Naturally Derived as it is
             Manufactured in a Lab. ..................................................................................20

       F)    The Sodium Citrate in the Products Is Manufactured, Not Naturally
             Derived............................................................................................................27

       G)    The Products Do Not Hydrate Better Than Water...............................................28

II.    These Misrepresentations Are Material to Consumers......................................................29

PLAINTIFF'S EXPERIENCES ...........................................................................................31

CLASS ALLEGATIONS ......................................................................................................32

PRAYER FOR RELIEF .......................................................................................................40

JURY TRIAL DEMANDED.................................................................................................41

Plaintiff Michael Walsh ("Plaintiff"), individually and on behalf of all others similarly situated, by and through undersigned counsel, brings this class action against Defendant PepsiCo, Inc., ("Pepsi") and The Gatorade Company ("Gatorade") (collectively, "Defendants") and complains and alleges upon personal knowledge as to himself and upon information and belief as to all other matters.

## NATURE OF THE ACTION

1. This is a class action on behalf of purchasers of some of the most popular selling versions of Gatorade: classic Gatorade ("Classic Gatorade"), Gatorade Zero ("Gatorade Zero"), Gatorade Zero Thirst Quencher Powder ("Gatorade Powder"), and the "Lower Sugar" formulation of Gatorade ("LS Gatorade"), which come in numerous different flavors and can be found in almost any grocery store, convenience shop, or gas station (collectively, the "Products").

2. In 2024 through July 2025, Gatorade dominated the U.S. sports drink market with sales surpassing $7.5 billion, accounting for approximately 60% of the hydration market.[1]

3. Included in Defendants' market share is the ever-growing cohort of consumers who are health-focused and purposefully, often painstakingly, attempting to eliminate artificial flavoring, colorings, and additives from their diet. "Nearly two out of three consumers say that ingredients have at least a moderate influence on their food and beverage purchases"[2] and approximately half of all United States consumers—and 79% of "health-focused shoppers"—are "worried about health risks from artificial ingredients, chemicals, and/or preservatives in foods."[3]

4. As described herein, Defendants are attempting to monetize the explosion of this

---

[1] Chloe Alverson, *2025 State of the Beverage Industry: Sports, protein drink market experiences growth*, Beverage Industry (Jul. 2, 2025), https://www.bevindustry.com/articles/97621-2025-state-of-the-beverage-industry-sports-protein-drink-market-experiences-growth.

[2] Lauren Manning, *Consumers are paying more attention to ingredient lists, report finds*, FOOD DIVE (Jun. 18, 2021), https://www.fooddive.com/news/consumers-are-paying-more-attention-to-ingredient-lists-report-finds/601925/.

[3] Danielle Romano, *U.S. Shoppers Are Concerned About Artificial Ingredients in Food*, CONVENIENCE STORE NEWS (Mar. 2, 2026), https://csnews.com/us-shoppers-are-concerned-about-artificial-ingredients-food#:~:text=Consumers%20report%20that%20they%20are,79%25%20of%20health%2Dfocused%20shoppers.

growing market of health-focused shoppers by falsely claiming that the Products have benefits they do not, in fact, have—and falsely claiming that the Products *lack* artificial flavorings and ingredients that they, in fact, contain.

5.     This consumer class action arises from Defendants' systemic practices of marketing, advertising, and labeling the Products using false, misleading, and deceptive representations. The Products are sold to address consumer needs and demands within the same market section. Each of the four Products – Gatorade, Gatorade Zero, Gatorade Powder, and LS Gatorade – are marketed with similar material claims regarding its characteristics, qualities, ingredients, benefits, or performance that are untrue, misleading, or lack adequate substantiation. Through these uniform misrepresentations and omissions, Defendants have induced consumers to purchase products they otherwise would not have purchased, or to pay a premium price for products that do not possess the attributes promised on the labels and in Defendants' marketing materials and websites. Accordingly, Plaintiff brings this action on behalf of himself and similarly situation consumers seeking redress for Defendants' violations of applicable state consumer protection laws and for the economic injury caused by Defendants' deceptive conduct.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

6.    First, Defendants deceptively label each of the four Products as "HYDRATES **BETTER** THAN WATER." This claim is false and misleading because any hydration benefit Gatorade has over water applies *only* when the consumer is sweating, which is not the case for most consumers.



7. Second, Defendants further market and label the LS Gatorade products as "science-backed hydration with no artificial flavors, sweeteners or colors,"[4] as prominently stated on the Gatorade Website and LS Gatorade labels even though that statement is not true because LS Gatorade contains artificial flavorings in the form of citric acid and sodium citrate.



8. Third, Defendants market and label Gatorade Powder Sticks as containing "no added colors or artificial flavors" and as "naturally flavored with other natural flavors." This statement is false because Gatorade Powder Sticks also contain artificial flavorings in the form of citric acid and sodium citrate.

---

[4] *Gatorade Launches Lower Sugar Hydration with No Artificial Flavors, Sweeteners or Colors and 75% Less Sugar Than Gatorade Thirst Quencher* ("*Gatorade Lower Sugar Announcement*"), GATORADE (Mar. 4, 2026), https://www.gatorade.com/resources/gatorade-launches-lower-sugar-hydration-with-no-artificial-flavors-sweeteners-colors.



9.     Last, Defendants market and label Classic Gatorade and Gatorade Zero as "naturally flavored with other natural flavors." Yet again, this statement is false because Classic Gatorade and Gatorade Zero also contain artificial flavorings in the form of citric acid and sodium citrate.

10.     Citric acid is a commonly-used flavoring which, over 99% of the time, is artificially produced and manufactured from a processed derivative of black mold caused *Aspergillus niger* – which may cause allergic reactions and disease in humans.[5] Citric acid is also a common cause of various negative side effects including swelling and stiffness, joint pain, muscle pain, stomach pain, and respiratory symptoms.[6]

---

[5] I. Sweis & B. Cressey, *Potential role of the common food additive manufactured citric acid in eliciting significant inflammatory reactions contributing to serious disease states: A series for four case reports* ("Sweis Report"), 5 TOXICOLOGY REPS., 808-12 (2018), https://pubmed.ncbi.nlm.nih.gov/30128297/.

[6] *Id*.

11. Sodium citrate is a synthetic byproduct of manufactured citric acid and another artificial flavoring.

12. Plaintiff and Class members are purchasers of the Products who were induced to pay a price premium as a result of Defendants' false and misleading statements: (1) the Products claim to have no "artificial flavors, sweeteners, or added colors," or to be "naturally flavored," which is false because of the inclusion of citric acid and sodium citrate as prominent ingredients on the label; and (2) the Products inaccurately claim to be more hydrating than water.

13. Had they known the truth, Plaintiff and Class members *would not have purchased* the Products or *would have paid less*.

14. Accordingly, Plaintiff seeks monetary and injunctive relief against Defendants for violating the New York Gen. Bus. Law §§ 349-350 ("GBL"), California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*; the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq*.

## **PARTIES**

15. Plaintiff Michael Walsh is a resident of Whittier, California.

16. Plaintiff has purchased LS Gatorade beverages with the claim "Hydrates Better than Water" and "no artificial flavors, sweeteners, or added colors" several times. His most recent purchase was on June 3, 2026 for two LS Gatorade bottles from Target in Pico Rivera, California for $1.69 each.

17. Defendant PepsiCo, Inc. ("Pepsi") maintains its principal place of business located in Harrison, New York.

18. Upon information and belief, Defendant Pepsi owns Gatorade.

19. Defendant Pepsi or Defendant's subsidiary or affiliate markets, manufactures, distributes, sells, or otherwise is responsible for the placement of the Products at their stores both online and at retail.

6

20.     Defendant The Gatorade Company ("Gatorade Co.") maintains its principal place of business located at 433 W. Van Buren Street, Suite 3N, Chicago, Illinois 60607.

21.     Upon information and belief, Defendant Gatorade Co. is a subsidiary of Pepsi.

22.     Defendants market, manufacture, distribute, sell, or otherwise are responsible for the placement of the Products throughout the online and brick-and-mortar consumer chain.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over the subject-matter of this proposed class action pursuant to 28 U.S.C. § 1332(d), which, under the provisions of the Class Action Fairness Act ("CAFA"),  provides for the original jurisdiction of the federal courts in any class action in which at least 100 members are in the proposed plaintiff class, any member of the plaintiff class is a citizen of a State different from any defendant, and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs. Plaintiff alleges that the total claims of individual members of the proposed Class (as defined herein) are in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs.

24.     This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. This Court has personal jurisdiction over Defendants because they are authorized to do business and conducts business in New York, have specifically marketed and sold their products services in New York, and have sufficient minimum contacts with this state and/or sufficiently avail themselves of the markets of this state to render the exercise of jurisdiction by this Court permissible. Moreover, Defendant Pepsi is headquartered in this District.

25.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims asserted herein occurred in this District and Defendants are subject to personal jurisdiction to the federal court in this District. Moreover, Defendants inhabit and/or may be found in this judicial district and the interstate trade and commerce described herein is and has been carried out in part within this judicial district. Defendant Pepsi is also headquartered in this District.

## FACTUAL ALLEGATIONS

**I.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS**

**A)    LS Gatorade Products Contain False and Misleading Labels**

26.    Defendants prominently market the LS Gatorade as having "no artificial flavors, sweeteners, or colors from artificial sources" and as "hydrat[ing] **better** than water" on both the LS Gatorade labels and Gatorade's website, as shown below:





27. Additionally, the Fruit Punch flavor is labelled as "Naturally Flavored," while the other LS Gatorade flavors are labelled as "Naturally Flavored with Other Natural Flavors."

28. Directly next to the Natural Flavor claim on the product labels, Defendants include images of realistic fruit, implying that the Natural Flavors are derived directly from pictured fruits:



29. Defendants also market and sell LS Gatorade in multi-bottle packs called multipacks. Multipacks of LS Gatorade contain the same language and images relating to the "No

9

Artificial" and "Hydrates Better" claims:



> ### i)     "No Artificial" Claims on Social Media and Other Advertising.

30.     Similar claims are present in other forms of advertising as well. For example, Defendants reiterate the claims on social media posts and advertisements:

 

31.    The "No Artificial" claims are also reiterated in promotional videos posted by influencers, athletes, and celebrities.

32.    For example, the Gatorade Instagram account posted videos advertising Gatorade LS together with influencer Claire Kittle (wife of NFL player George Kittle) and professional golfer Roland Pollard. In both of these videos[7], pictured below, Defendants' paid partners reiterate the "No Artificial" and "Hydrates Better" claims.



_____

[7] The Kittle video can be found at: https://www.instagram.com/reel/DWm-CnejtB_/?igsh=MzRlODBiNWFlZA==; the Pollard video can be found at: https://www.instagram.com/reel/DXKIlYEDJcx/?igsh=MzRlODBiNWFlZA==.

ii)        **"No Artificial" Promotion and Sale on Third Party Retail Platforms.**

33.      Defendants market, promote, and sell their products through third-party retail platforms, including local grocery stores and nationwide retail chains, as well as big box and digital retailers like Target, Amazon, and Walmart.

34.      Defendants carry the "No Artificial" campaign onto every third-party retail platform where LS Gatorade sold. For example, on the Target website, the products are titled, e.g., "Gatorade Lower Sugar No Artificial Glacier Cherry"[8] and on the Walmart website, they are similarly titled, e.g., "Gatorade Lower Sugar, No Artificials Glacier Cherry Flavored Electrolyte Sports Drink."[9] Both websites include promotional images highlighting the "No Artificial" and "Hydrates Better" claims.

35.      On Amazon, Defendants claim LS Gatorade is "Gatorade with No Artificial Colors: Gatorade Lower Sugar delivers bold colors that Gatorade is known for without using artificial color sources" and "Gatorade Hydrates Better than Water: Ideal for lower intensity activity or when combined with another energy source[.]"[10]

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[8] *Gatorade Lower Sugar No Artificial Glacier Cherry - 12oz/12pk,* TARGET, https://www.target.com/p/gatorade-lower-sugar-no-artificial-glacier-cherry

[9] *Gatorade Lower Sugar, No Artificials Glacier Cherry Flavored Electrolyte Sports Drink, 12 fl oz Bottle, (12 pack), 75% Less Sugar, Hydration*, WALMART, https://www.walmart.com/ip/Gatorade-Lower-Sugar-Glacier-Cherry

[10] *Gatorade Lower Sugar Electrolyte Sports Drink, Rain Berry, 12 fl oz Bottles, (12 Pack), 75% Less Sugar, No Artificial Flavors, No Artificial Sweeteners, No Artificial Colors, Hydration*, AMAZON https://www.amazon.com/Gatorade-Electrolyte-Artificial-Sweeteners-Hydration

36.    Defendants' Amazon page also includes the following promotional image:



37.    Under "Special Ingredients" on the Amazon product pages for Gatorade LS, Defendants state: "No Artificial Flavors, Sweeteners, or Colors from Artificial Sources."

38.    Similarly, the "Hydrates Better" claims are repeated on third-party retailers' sites as it is clearly visible in promotional images of LS Gatorade, such as this image published by Walmart:



iii)     **Defendants' Misleading Claims on Its Own Website and Advertising.**

39.     On the Gatorade website, Defendants write: "Gatorade Lower Sugar answers growing consumer demand for hydration options that deliver on the taste and electrolyte performance Gatorade is known for, now with no artificial colors."[11]

40.     Under "Product Details," Defendants state the Products contain "no artificial flavors, sweeteners or colors from artificial sources."[12]

41.     Anuj Bhasin, Senior Vice President of Marketing for Gatorade said: "The campaign celebrates the inner 'IT' that keeps them moving, alongside a hydration solution with the flavors they know and love, but with no artificial flavors, sweeteners or colors and 75% less sugar than original Gatorade." [13]

42.     All of these claims are false and misleading, as demonstrated below, *see* Sec. I(E)-(G), *infra*.

**B)     Gatorade Powder Products Contain False and Misleading Claims on their Labels**

43.     Defendants prominently market Gatorade Powder as having "no added colors or artificial flavors," as "naturally flavored," and as "hydrat[ing] **better** than water" on both the Product labels and Gatorade's website, as shown below:

---

[11] *Gatorade Lower Sugar Announcement.*

[12] *Id.*

[13] *Id.*



44.    The "No Artificial" claim appears prominently on third party vendor websites such as Walmart and Target for all flavors of Gatorade Powder, as demonstrated by the below exemplars:



15



45.    Defendants also prominently feature the claim that Gatorade Powder "hydrate **better** than water":



46.    All of these claims are false and misleading, as demonstrated below, *see* Sec. I(E)-(G), *infra*.

**C)    Gatorade Zero Products Contain False and Misleading Labels**

47.    Similar to the LS Gatorade and Gatorade Powder products, Gatorade Zero products claim to be "naturally flavored with other natural flavors" in the front of the label.



48.    Moreover, the label prominently states that Gatorade Zero "hydrates **better** than water." This claim is also prominently featured in promotional materials for Gatorade Zero:



49.     Defendants also market and sell Gatorade Zero in multi-bottle packs called multipacks. Multipacks and related promotional materials of Gatorade Zero contain the same "Naturally Flavored" and "Hydrates Better" claims:





50.     These claims are false and misleading, as demonstrated below, *see* Sec. I(E)-(G), *infra*.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**D)      Classic Gatorade Products Contain False and Misleading Labels**

51.      Certain flavors of Classic Gatorade, such as Lemon Lime and Orange, claim to be "naturally flavored with other natural flavors" on the front of the label:



52.      Moreover, the label prominently states that Classic Gatorade "hydrates **better** than water." This claim is also prominently featured in promotional materials for Classic Gatorade:





53.    Defendants also market and sell Classic Gatorade in multi-bottle packs called multipacks. Multipacks and related promotional materials of Classic Gatorade contain the same "Naturally Flavored" and "Hydrates Better" claims:



54.    These claims are false and misleading, as demonstrated below, *see* Sec. I(E)-(G), *infra*.

**E)    The Citric Acid in the Four Products Is Not Naturally Derived as it is Manufactured in a Lab.**

55.     Defendants advertise the Products as free of artificial flavors, but this is false.

56. Citric acid and sodium citrate are listed as the third and fourth ingredients on the LS Gatorade label, which is shown below:

Water, sugar, citric acid, sodium citrate, salt, natural flavor, monopotassium phosphate, purified stevia leaf extract, vegetable juice (color), modified food starch, glycerol ester of rosin.

57. On the Gatorade Powder label, citric acid and sodium citrate are listed as the *first* and third ingredients, as shown below:

INGREDIENTS: CITRIC ACID, MALTODEXTRIN, SODIUM CITRATE, SALT, MONOPOTASSIUM PHOSPHATE, CONTAINS 2% OR LESS OF ACESULFAME POTASSIUM, NATURAL FLAVOR, MODIFIED TAPIOCA STARCH, SILICON DIOXIDE, SUCRALOSE.

58. On the Gatorade Zero label, citric acid and sodium citrate are listed as the second and third ingredients, as shown below:

Water, citric acid, sodium citrate, salt, monopotassium phosphate, modified food starch, natural flavor, sucralose, acesulfame potassium, glycerol ester of rosin, blue 1.

21

59.      On the Classic Gatorade label, citric acid and sodium citrate are listed as the fourth and fifth ingredients, as shown below:

Water, sugar, dextrose, citric acid, sodium citrate, salt, monopotassium phosphate, gum arabic, ascorbic acid (to protect color), natural flavor, glycerol ester of rosin, sucrose acetate isobutyrate, beta carotene (color).

60.      The citric acid used in the Products as a food additive is in fact *manufactured* citric acid: an "ubiquitous substance and one of the most common food additives in the world. Approximately 99% of the world production of citric acid is made through microbial processes using predominantly a mutant strain of the black mold *Aspergillus niger*."[14]

61.      Citric acid has not undergone FDA evaluation—indeed, "[n]o scientific studies exist investigating the safety of manufactured citric acid when consumed in large amounts for long periods"[15]—but it is nonetheless "of the most common additives used today"[16].

62.      Citric acid is "used to boost acidity, enhance flavor, and preserve ingredients."[17] Per the USDA, the "[m]ajor attractions of citric acid as a food and beverage acidulant are high solubility, extremely low toxicity, and pleasant sour taste[.]"[18]

63.      As explained by University of Illinois surgeons in the *Sweis Report*: "[i]n 1917, American food chemist James Currie had begun experimenting with a process of making citric acid from mold. Currie discovered that strains of *Aspergillus niger* provided high yields of citric acid through a fermentation process using low cost molasses as the raw material. This system was

[14] *Sweis Report*, at 808.

[15] *What Is Citric Acid? Benefits, Uses, Safety & Side Effects*, HEALTHLINE, https://www.healthline.com/nutrition/citric-acid#artificial-sources.

[16] *Id.*

[17] *What is Citric Acid?*

[18] *Citric Acid Technical Evaluation Report*, at 20, USDA AMS (2015), https://www.ams.usda.gov/sites/default/files/media/Citric%20Acid%20TR%202015.pdf.

very cost effective and rapidly adopted. Pfizer started to produce citric acid from *Aspergillus niger* in 1919, and this method is still used today across the world, particularly in China."[19]

64.    Although citric acid occurs naturally in citrus fruits, commercial extraction from fruit is not feasible at scale. In 1995, the USDA wrote that citric acid in its natural form, i.e. as obtained "[t]raditionally by extraction from citrus juice[, is] no longer commercially available."[20] In 2015, the USDA reiterated that "[c]itric acid purified from citrus fruits is technically feasible, but whether it is economically possible is unknown."[21]

65.    For these reasons, 99% of the citric acid in our food and drink products is in fact MCA derived from *Aspergillus niger*.[22] The USDA has gone even further, stating that industrial fermentation using *Aspergillus niger* "exclusively" accounts for citric acid production.[23]

66.    The process to create ***manufactured citric acid*** is lengthy and was described at length by the USDA in 2015. The most common method for manufacturing citric acid is known as "precipitation," and is depicted in the below flowchart.[24]

---

[19] *Sweis Report*, at 808-09.

[20] *Citric Acid Technical Report*, USDA AMS (1995),

https://www.ams.usda.gov/sites/default/files/media/Citric%20Acid%20TR%201995.pdf.

[21] *Citric Acid Technical Evaluation Report*, at 25.

[22] *Sweis Report*, at 808.

[23] *Citric Acid Technical Evaluation Report*, at 10.

[24] *Id*. at 13-14.



67.    Ultimately, the process of manufacturing citric acid results in "a clear to white crystalline solid. It is odorless and has a strong acidic (sour) taste."[25]

68.    None of these processes result in any "natural" flavoring. To the contrary, each of the available manufacturing methods for citric acid are industrial chemical processes that convert fermented broth into the "odorless," strongly acidic "clear to white crystalline solid" that is manufactured citric acid.

---

[25] *Citric Acid Technical Evaluation Report*, at 3.

69.     The FDA has not formally defined "natural" or "No Artificial," but the "FDA has considered the term 'natural' to mean that nothing artificial or synthetic (including all color additives regardless of source) has been included in, or has been added to, a food that would not normally be expected to be in that food."[26]

70.     The FDA has repeatedly sent warning letters to companies advertising products as containing no artificial flavoring when they contain citric acid. For instance, in an August 16, 2001 Warning Letter sent to Oak Tree Farm Dairy, Inc., the FDA wrote that "100% NATURAL" and "ALL NATURAL" representations were "inappropriate" because the product "contains citric acid."[27] Likewise, in an August 29, 2001 Warning Letter to the Hirzel Canning Company, the FDA wrote that "the addition of . . . citric acid to these products preclude[s] the use of the term 'natural' to describe this product."[28]

71.     The FDA lists citric acid as a Preservative.[29]

72.     During its review of citric acid in 1995, the USDA categorized citric acid as "synthetic" rather than "natural":

**Name of Material:** Citric Acid

**Reviewer Name:** Steven Harper

**Is this substance Natural or Synthetic? Explain (if appropriate)**

Synthetic

73.     The reviewer expands, writing of citric acid: "It is a natural occurring substance that commercially goes through numerous chemical processes to get to it's [sic] final usable form.

---

[26] *U.S. Food & Drug Admin., Use of the Term "Natural" on Food Labeling*, FDA (Mar. 2022), https://www.fda.gov/food/food-labeling-nutrition/use-term-natural-food-labeling.

[27] *Jones v. ConAgra Foods, Inc.*, 3:12-cv-01633-CRB (N.D.Cal.), ECF No. 95-2.

[28] *Id.* at ECF No. 95-1.

[29] *Types of Food Ingredients*, FDA (updated Jul. 6, 2023), https://www.fda.gov/food/food-additives-and-gras-ingredients-information-consumers/types-food-ingredients.

This processing would suggest that it be classified as synthetic."[30]

74.    By 2015, the USDA had adopted a slightly different approach, categorizing citric acid as a "nonagricultural (nonorganic) allowed nonsynthetic under 'acids'[.]"[31]

75.    Although "[t]he molecular formula of the natural citric acid obtained from lemons and limes and that of [manufactured citric acid] is the same, . . . the potential presence of impurities or fragments from the *Aspergillus niger* in [manufactured citric acid] is a significant difference that may trigger deleterious effects when ingested[,]" including inflammation and other physical symptoms.[32] Specifically, the *Sweis Report* exposes reports of "joint pain with swelling and stiffness, muscular pain, dyspnea, abdominal cramping and enervation that typically begin within 2–12 h of ingesting foods, beverages or vitamins containing [manufactured citric acid]."[33]

76.    In 2024-25, Gatorade dominated the U.S. sports drink market with sales surpassing $7.5 billion, accounting for approximately 60% of the hydration market.[34] Given that 99% of all citric acid is manufactured through the afore-described artificial process, the citric acid contained in the Products is *manufactured* citric acid.

77.    Citric acid is the third listed ingredient on the labels of all flavors of, e.g., LS Gatorade—just after water and sugar and preceding "Natural Flavor" by several spots. It is in the top five ingredients across all Products:

---

[30] *Citric Acid Technical Report* (1995) at 5.

[31] *Citric Acid Technical Evaluation Report*, at 1.

[32] *Sweis Report*, at 809.

[33] *Id*.

[34] Alverson, *2025 State of the Beverage Industry*.

Water, sugar, citric acid, sodium citrate, salt, natural flavor, monopotassium phosphate, purified stevia leaf extract, vegetable juice (color), modified food starch, glycerol ester of rosin.

78.     As stated by the USDA in 1995, one of the "[m]ajor attractions of citric acid" is its "pleasant sour taste[.]"[35] Accordingly, an inference can be drawn that citric acid contributes materially to the flavor of the Products.

79.     If citric acid were removed or substantially reduced, the taste of the Products would be materially altered. Manufactured citric acid supplies the tart and sour flavor central to the Products and necessarily functions "to impart flavor" to the Products (as well as a preservative).

80.     Accordingly, Defendants' claim that the Products contain "no artificial flavors, sweeteners, or colors from artificial sources" is false and misleading.

**F)     The Sodium Citrate in the Products Is Manufactured, Not Naturally Derived**

81.     Also on the Products' ingredients list is sodium citrate, an artificial ingredient that imparts tart flavor to the Products.

82.     Sodium citrate is a synthetic byproduct of citric acid "produced by chemical reaction with citric acid and the hydroxide or carbonate," and is a "clear to white crystalline solid[] with an acidic (sour) taste, with some having a slightly salty taste."[36]

83.     Sodium citrate is categorized as an allowed nonagricultural, synthetic substance. 7 C.F.R. § 205.605(b)(31).

84.     As the USDA explains: "Sodium citrate is chiefly used as a food additive, usually

---

[35] *Citric Acid Technical Evaluation Report*, at 20.

[36] *Id.* at 3.

for flavoring or as a preservative."[37] For example, "Sodium citrate gives club soda both its sour and salty flavors. It is common in lemon-lime soft drinks, and it is partly what causes them to have their sour taste."[38]

85.     Sodium citrate is in the top five ingredients across all Products.

86.     If sodium citrate were removed or substantially reduced, the taste of the Products would be materially altered. Sodium citrate supplies the tart and sour flavor central to the Products and necessarily functions "to impart flavor" to the Products.

87.     Thus, for this additional reason, Defendants' claim that the Products contain "no artificial flavors, sweeteners, or colors from artificial sources" is false and misleading.

### G)     The Products Do Not Hydrate Better Than Water

88.     In bold, caps-locked letters, Defendants claims that the Products "HYDRATE[] **BETTER** THAN WATER." This is false for most consumers.

89.     When a person sweats, their body loses both water and electrolytes, sodium, and carbohydrates. Gatorade's advantage as compared to water is that it replaces those electrolytes, sodium, and carbohydrates. However, this does not equal better hydration *unless* the consumer drinks Gatorade in conjunction with physical exercise.

90.     For consumers drinking Gatorade *while not sweating*, the Gatorade provides no extra hydration benefits and instead floods their body with unnecessary sugars.[39]

91.     For example, Classic Gatorade contains 69% of a person's daily added sugar intake per bottle and Gatorade LS contains 16% of a person's daily sugar intake per bottle.

92.     Defendants' own research confirms that any hydration benefit Gatorade has over

---

[37] *Id.* at 21.

[38] *Id.*

[39] *See* Claire Paddock, Nick Ruggiero, Dan Smith, *Gatorade: Do "Average Joe"s* [sic] *Need to Hydrate Like Professional Athletes?*, UNIVERSITY OF DELAWARE (Feb. 27, 2018), https://sites.udel.edu/coe-engex/2018/02/27/gatorade-do-average-joes-need-to-hydrate-like-professional-athletes/.

water applies *only* when the consumer is sweating. In an article titled "How Gatorade Works & Why It Can Hydrate Better Than Water" (a title that betrays the exaggeration in Defendants' label that the Products "HYDRATE[] **BETTER** THAN WATER"), Defendants affirm that "[d]uring exercise — especially sessions longer than 60 minutes — consumers lose" fluids, sodium, electrolytes, and carbohydrates.[40] "Water replaces fluid. Gatorade products are formulated to help replace what sweat takes out[,]" e.g., sodium, electrolytes, and carbohydrates.

93.     Defendants also state: "the goal isn't to replace water[.]" This contradicts the plain statement on the Product labels claiming to consumers that they hydrate **better** than water.

94.     As medically reviewed articles about Gatorade products state:

… many people use sports drinks like Gatorade for daily hydration, which is not what they are intended for. There isn't strong research showing the benefits of sports drinks for low-intensity exercise lasting less than an hour… plain water is usually the best choice.[41]

95.     Accordingly, Defendants' claim that the Products "hydrate[] **better** than water" is false and misleading.

## II.     THESE MISREPRESENTATIONS ARE MATERIAL TO CONSUMERS

96.     "Nearly two out of three consumers say that ingredients have at least a moderate influence on their food and beverage purchases"[42] and approximately half of all United States consumers—and 79% of "health-focused shoppers"—are "worried about health risks from artificial ingredients, chemicals, and/or preservatives in foods."[43]

---

[40] *How Gatorade Works & Why It Can Hydrate Better Than Water*, GATORADE (Feb. 24, 2026), https://www.gatorade.com/resources/how-gatorade-works-and-why-it-can-hydrate-better-than-water.

[41] Lindsey DeSoto, *Does Gatorade Effectively Hydrate You?*, HEALTH (Jan. 16, 2026), https://www.health.com/does-gatorade-hydrate-you-11754011.

[42] Lauren Manning, *Consumers are paying more attention to ingredient lists, report finds*, FOOD DIVE (Jun. 18, 2021), https://www.fooddive.com/news/consumers-are-paying-more-attention-to-ingredient-lists-report-finds/601925/.

[43] Romano, *U.S. Shoppers Are Concerned About Artificial Ingredients in Food*.

29

97.     Statements like Defendants' "No Artificial" and "Hydrates Better" claims strongly influence purchasing decisions, steering consumers to choose and pay more for products that prominently make "No Artificial" and "Hydrates Better" label claims over those that do not.

98.     Defendants' "No Artificial" and "Hydrates Better" claims are part of a deliberate marketing strategy designed to capitalize on this demand. Defendants know that consumers place a premium on products free of artificial flavors and that such claims materially increase marketability and sales. But those statements are false and misleading.

99.     As alleged above, Defendants flavor the Products with artificial citric acid and sodium citrate. Each of these flavorings is nonagricultural, and sodium citrate is defined by the USDA as synthetic. No reasonable consumer would expect a product labelled as having no artificial flavors to contain citric acid derived from *Aspergillus niger* or its byproduct sodium citrate.

100.    Consumers who sought to avoid artificial flavors reasonably relied on Defendants' representations and did not receive the natural, wholesome product they believed they were purchasing. Defendants, meanwhile, obtained an unfair competitive advantage and extracted a price premium based on these deceptive and material misrepresentations.

101.    Similarly, consumers who sought hydration "better than water" reasonably relied on Defendants' representations and did not receive the level of hydration promised on the Products' labels. Defendants, meanwhile, obtained an unfair competitive advantage and extracted a price premium based on these deceptive and material misrepresentations.

102.    Defendants charge a price premium for the Products, and that premium is tied directly to their "No Artificial" and "Hydrates Better" marketing. By falsely presenting the Products as free of artificial flavors and as hydrating better than water, Defendants positioned them as superior to any competing products that truthfully disclose the Products' artificial flavoring and the reality of the hydration provided by the Products.

103.    Defendants' conduct misleads reasonable consumers, distorts competition, and, ultimately, results in economic harm. Consumers paid more than they otherwise would have for a

product that lacked advertised benefits. This widespread deception erodes consumer trust in the truth of product labeling and marketing.

104. Due to Defendants' large market share and significant sales of the Products, there are likely tens-to-hundreds of thousands of consumers who have purchased and are continuing to purchase the Products based on Defendants' misrepresentations.

105. Given that the Products contain artificial flavors and do not provide more hydration than water, those consumers are being materially misled and induced to pay a price premium by Defendants' deceptive conduct.

106. As such, Plaintiff and Class members were harmed in the form of the monies they paid for the Products which they would not have paid had they known the truth.

## PLAINTIFF'S EXPERIENCES

107. Plaintiff bought purchased LS Gatorade beverages with the claim "Hydrates Better than Water" and "no artificial flavors, sweeteners, or added colors" several times. His most recent purchase was on June 3, 2026 for two LS Gatorade bottles from Target in Pico Rivera, California.

108. Plaintiff purchased the Products in reliance on the "No Artificial" and "Hydrates Better" claims, which led Plaintiff to believe that the Products contained no artificial flavorings—including manufactured citric acid and its byproduct sodium citrate, and that the Products hydrated better than water as a general matter.

109. Plaintiff paid a premium price of approximately $1.69 per bottle of LS Gatorade.

110. The Products Plaintiff purchased did not and could not provide the "No Artificial" and "Hydrates Better" benefits as promised by Defendants.

111. Plaintiff chose between the Products and other similar products, but which did not misrepresent their attributes, and chose the Products due to Defendants misleading "No Artificial" and "Hydrates Better" claims.

112. Had Plaintiff known the truth about Defendants' misrepresentations, he would not have purchased the Products, or would not have paid as much for them.

31

113.    As a result, Plaintiff suffered injury in fact and lost money at the time of purchase. Plaintiff continues to desire to purchase sports drink products that, in reality, contain "no artificial flavors, sweeteners, or colors from artificial sources" and "hydrate better than water" and would purchase such a product manufactured by Defendants if it were possible to determine prior to purchase the veracity of Defendants' claims.

114.    Each and every consumer who purchases the Products is exposed to the deceptive "No Artificial" and "Hydrates Better" representations, which appeared prominently and conspicuously on the front of the Product packaging during the Class Period.

115.    Defendants' misrepresentations and mislabeling caused Plaintiff and members of the proposed class to pay a price premium for the Products because they believed that they were purchasing a specialty product that contained "no artificial flavors, sweeteners, or colors from artificial sources" and "hydrates better than water." Had Plaintiff known the truth about the Products, he would not have purchased them or, at a minimum, he would have paid less for them.

## CLASS ALLEGATIONS

116.    Plaintiff brings this Action individually and on behalf of all other persons similarly situated pursuant to Fed. R. Civ. P. 23, seeking certification of the proposed classes (collectively, the "Class"):

> **Nationwide Class:** All persons within the United States who purchased any of the Products from March 1, 2026 through the date of judgment or until the conduct alleged ceases ("Class Period").

117.    Additionally, Plaintiff brings this Action on behalf of the following subclasses:

> **California State Sub-Class:** All persons within the State of California who purchased any of the Products during the Class Period.

118.    Excluded from the proposed Class are Defendants and any such entities in which the Defendants have a controlling interest, the Defendants' agents, employees and legal

32

representatives, any judge or judicial officer to whom this matter is assigned and any member of such judge or judicial officers' staff and immediately family, as well as all resellers of the Products.

119.    **Numerosity.** The members of the Class are so numerous that joinder would be inefficient and impracticable. Based upon Defendants' annual sales statistics, there are at least tens of thousands of Class members across the country.

120.    **Commonality.** There are common questions of law and fact relevant to the Class, and these questions predominate over any questions affecting individual Class members. These common questions of law and fact include, without limitation:

a)  whether Defendants violated state and common law statutes and doctrines;

b)  whether Defendants engaged in the conduct as alleged;

c)  Whether Defendants breached express warranties;

d)  Whether Defendants failed to warn of the risks that followed the foreseeable use of its Products;

e)  Whether Defendants were unjustly enriched;

f)  Whether Plaintiff was harmed;

g)  The measure of damages to Plaintiff and Class members; and,

h)  Whether Plaintiff is entitled to declaratory and injunctive relief.

121.    **Typicality.** Plaintiff's claims are typical of those of other Class members because Plaintiff, like every other Class member, was harmed by way of the conduct as alleged herein. Plaintiff, like all other Class members, was injured by Defendants' uniform conduct. Plaintiff is advancing the same claims and legal theories on behalf of himself and all other Class members, such that there are no defenses unique to Plaintiff. The claims of Plaintiff and those of the other Class members arise from the same operative facts and are based on the same legal theories.

122.    **Adequacy of Representation.** Plaintiff will fairly and adequately represent and protect the interests of the Class members in that he has no disabling or disqualifying conflicts of interest that would be antagonistic to those of the other members of the Class. The damages and infringement of rights that Plaintiff suffered are typical of other Class members, and Plaintiff seeks

33

no relief that is antagonistic or adverse to the members of the Class. Plaintiff has retained counsel experienced in consumer protection class action litigation, and Plaintiff intends to prosecute his action vigorously.

123. **Superiority of Class Action.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual lawsuits would not be economically feasible for individual Class members, and certification as a class action will preserve judicial resources by allowing the Class common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based on an identical set of facts. In addition, without a class action, it is likely that many members of the Class will remain unaware of the claims they may possess.

124. The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws and the ascertainable identities of Class members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

125. Adequate notice can be given to Class members directly using information maintained in the parties' records.

126. **Predominance.** The issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

127. This proposed class action does not present any unique management difficulties.

128. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

129. The prerequisites to maintaining a class action for equitable relief are met as Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate equitable relief with respect to the Class as a whole.

130. The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendants. For

34

example, one court might enjoin Defendants from performing the challenged acts, whereas another might not. Additionally, individual actions could be dispositive of the interests of the even where certain class members are not parties to such actions.

## CAUSES OF ACTION

### COUNT I
**Deceptive Acts Or Practices, New York Gen. Bus. Law § 349**

131. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

132. Plaintiff brings this claim on behalf of the Nationwide Class.

133. By the acts and conduct alleged herein, Defendants have committed unfair or deceptive acts and practices by making false representations regarding the Products.

134. The foregoing deceptive acts and practices are misleading in a material way because the Products lack the promised hydration benefits and contain artificial flavorings in the form of citric acid and sodium citrate.

135. Plaintiff and members of the Class were injured as a result because they would not have purchased and used the Products had they known the truth and because they overpaid for the Products on account of Defendant's misrepresentations.

136. On behalf of themselves and other members of the class, Plaintiffs seek to enjoin the unlawful acts and practices described herein, to recover their actual damages or fifty dollars, whichever is greater, and/or three times actual damages, and reasonable attorneys' fees and costs of suit.

### COUNT II
**False Advertising, New York Gen. Bus. Law § 350**

137. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

138. Plaintiff brings this claim individually and on behalf of members of the Nationwide Class against Defendants.

35

139. Based on the foregoing, Defendants have engaged in consumer-oriented conduct that is deceptive or misleading in a material way which constitutes false advertising in violation of Section 350 of the New York General Business Law because the Products do not confer the advertised benefits. The foregoing advertising was directed at consumers and was likely to mislead a reasonable consumer acting reasonably under the circumstances.

140. This misrepresentation has resulted in consumer injury or harm to the public interest.

141. As a result of this misrepresentation, Plaintiff and members of the Class have suffered economic injury because (a) they would not have purchased the Products had they known the truth and (b) they overpaid for the Products on account of Defendants' misrepresentations.

142. On behalf of himself and other members of the class, Plaintiff seeks to enjoin the unlawful acts and practices described herein, to recover their actual damages or five hundred dollars, whichever is greater, and/or three times actual damages, and reasonable attorneys' fees and costs of suit.

### <u>COUNT III</u>
**Violation of Business & Professions Code §§ 17200, *et seq*. (California Consumer Protection Statute for the proposed class)**

143. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

144. Plaintiff brings this claim individually and on behalf of the California Subclass as defined above.

145. Plaintiff and the proposed class members desired to purchase the Products based on Defendants' misleading "No Artificial" and "Hydrates Better" claims.

146. The Unfair Competition Law, Business & Professions Code §§ 17200, *et seq*. ("UCL"), prohibits any "unlawful," "unfair," or "fraudulent" business act or practice and any false or misleading advertising.

147. **Unlawful Business Practices**: In the course of conducting business, Defendants committed "unlawful" business practices in violation of the UCL by, inter alia, making "No

Artificial" and "Hydrates Better" claims, which are false, misleading, and deceptive (which also constitutes advertising within the meaning of § 17200); violating the Consumers Legal Remedies Act, California Civil Code §§ 1750, *et seq*.

148.    Plaintiff and the proposed class reserve the right to allege other violations of law, which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this date.

149.    **Unfair Business Practices**: In the course of conducting business, Defendants committed "unfair" business acts and practices by, inter alia, making "No Artificial" and "Hydrates Better" claims, which are false, misleading, and deceptive (which also constitutes advertising within the meaning of § 17200). There is no societal benefit from false advertising, only harm. While Plaintiff and the public at large were and continue to be harmed, Defendants have been unjustly enriched by its false, misleading, and deceptive representation as it unfairly enticed Plaintiff and the proposed class members to purchase the Products instead of similar, less expensive beverages sold by other manufacturers. Because the utility of Defendants' conduct (zero) is outweighed by the gravity of harm to Plaintiff, consumers, and the competitive market, Defendants' conduct is "unfair."

150.    There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein. For example, Defendants could have sold the Products without the "No Artificial" and "Hydrates Better" claims.

151.    **Fraudulent Business Practices**: In the course of conducting business, Defendants committed "fraudulent business act[s] or practices" and deceptive or misleading advertising by, inter alia, making the "No Artificial" and "Hydrates Better" claims, which are false, misleading, and deceptive to reasonable consumers.

152.    Defendants' actions, claims, and misleading statements, as more fully set forth above, are misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code §§ 17200, *et seq*.

153.    Plaintiff relied on Defendants' "No Artificial" and "Hydrates Better" claims and was in fact injured as a result of those false, misleading, and deceptive representation.

154.    As alleged herein, Plaintiff and the proposed class members have suffered injury in fact and lost money or property at the time of purchase as a result of Defendants' conduct because they were exposed to and purchased Defendants' Products in reliance on the "No Artificial" and "Hydrates Better" claims.

155.    Unless restrained and enjoined, Defendants will continue to engage in the above-described conduct. Accordingly, injunctive relief is appropriate.

156.    Plaintiff and the proposed class members seek declaratory relief and an injunction prohibiting Defendants from continuing such practices, corrective advertising, restitution of all money obtained from Plaintiff and the proposed class members collected as a result of unfair competition, and all other relief this Court deems appropriate, consistent with Business & Professions Code § 17203.

**COUNT IV**
**Violations of California's False Advertising Law Bus. & Prof. Code §§ 17500 & 17501 *et seq.***

157.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

158.    Plaintiff brings this cause of action individually and on behalf of the California Subclass defined above.

159.    Defendants have violated Sections 17500 and 17501 of the Business and Professions Code.

160.    Defendants have violated, and continue to violate, Section 17500 of the Business and Professions Code by disseminating untrue and misleading advertisements to Plaintiff and class members.

161.    Defendants engaged in a campaign of false and misleading advertising and marketing with regard to the benefits of its Products to deceive consumers into believing that the

38

Products were more hydrating than water and were free of artificial flavoring – when, in reality, this was untrue.

162.   Because Plaintiff bought these Products numerous times, Plaintiff has standing to pursue this claim because he has suffered an economic injury due to lost money or property as a result of Defendants' acts or practices. When Plaintiff purchased the Products, he relied on false, misleading and deceptive representations which led him to believe that the Products as were as advertised on their packaging. Plaintiff spent money in the transaction that he otherwise would not have spent had he known the truth about Defendants' Products.

163.   Defendants' conduct was deceptive in a materially misleading way because it violates consumers' reasonable expectations. Defendants knew consumers would purchase its Products and/or pay more for them under the false – but reasonable – belief that they were consistent with advertising and packaging.

164.   Defendants knew that the "No Artificial" and "Hydrates Better" claims on its Products, which are specifically marketed toward health-conscious purchasers, are material to consumers. As a result of its false advertising, Defendants sold tens-to-hundreds of thousands of units of the Products to unsuspecting consumers nationwide.

165.   As a direct and proximate result of Defendants' false, misleading and deceptive representations and/or omissions, Plaintiff and Class members were injured in that they: (1) overpaid for the Products that were not what Defendants represented, (2) were deprived of the benefit of the bargain because these Products were different than what was advertised and marketed, and (3) were deprived of the benefit of the bargain because the Products they purchased had less value than if Defendants had adequately disclosed the truth about them.

166.   On behalf of himself and Class members, Plaintiff seeks to enjoin Defendants' unlawful acts and practices.

167.   On behalf of himself and Class members, Plaintiff also seeks to recover his actual damages or $500.00 in statutory penalties, whichever is greater, three times his actual damages, and reasonable attorneys' fees.

## COUNT V
### Violations of the Consumer Legal Remedies Act – Cal. Civ. Code §§ 1750, *et seq.*
### (California Consumer Protection Statute for the proposed class)

168.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

169.    Plaintiff brings this cause of action individually and on behalf of the California Subclass as defined above.

170.    Plaintiff brings this claim individually and on behalf of similarly situated California consumers pursuant to the Consumers Legal Remedies Act, California Civil Code §§ 1750, *et seq*. (the "CLRA").

171.    Plaintiff is a consumer as defined by California Civil Code § 1761(d).

172.    The Product is a "good" within the meaning of the CLRA.

173.    Defendants violated and continue to violate the CLRA by "[r]epresenting that [the Product has] . . . characteristics, . . . uses [and] benefits . . . which [it does] not have" and "[r]epresenting that [the Product is] of a particular standard, quality, or grade … if [it is] of another" in transactions with Plaintiff and the proposed class members which were intended to result in, and did result in, the sale of the Products. *See* California Civil Code § 1770(a)(5), (7).

174.    Pursuant to California Civil Code § 1782(d), Plaintiff and the proposed class members seek a Court Order declaring Defendants to be in violation of the CLRA and enjoining the above-described wrongful acts and practices of Defendants.

175.    Pursuant to § 1782 of the CLRA, Plaintiff will notify Defendants in writing by certified mail of the particular violations of § 1770 of the CLRA and demanded that Defendants rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendants' intent to so act. Following the required 30-day notice period, Plaintiffs intend to amend to add requests for restitution and disgorgement to this Count.

### PRAYER FOR RELIEF

Plaintiff, individually, and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in his favor and against Defendants as follows:

40

A.      For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class, and Plaintiff's attorneys as Class Counsel to represent the class members;

B.      For an order declaring that Defendants' conduct violates the statutes and laws referenced herein;

C.      For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

D.      For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

E.      For injunctive relief on behalf of Plaintiff, the Class, and the general public enjoining the illegal acts detailed herein;

F.      For prejudgment interest on all amounts awarded;

G.      For an order of restitution and all other forms of equitable monetary relief;

H.      For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Respectfully submitted,

**KAPLAN FOX & KILSHEIMER LLP**

DATED: June 18, 2026          By: /s/ *Aaron L. Schwartz*
                                        Aaron L. Schwartz

Aaron L. Schwartz
800 Third Avenue, 38th Floor
New York, NY 10022
Telephone: 212-687-1980
Email: *aschwartz@kaplanfox.com*

**KAPLAN FOX & KILSHEIMER LLP**
Laurence D. King
Matthew B. George (*pro hac vice* forthcoming)
Blair E. Reed (*pro hac vice* forthcoming)
Clarissa R. Olivares (*pro hac vice* forthcoming)
1999 Harrison Street, Suite 1501

41

Oakland, CA 94612
Telephone: 415-772-4700
Facsimile: 415-772-4707
Email: *lking@kaplanfox.com*
    *mgeorge@kaplanfox.com*
    *breed@kaplanfox.com*
    *colivares@kaplanfox.com*

*Attorneys for Plaintiff and the Proposed Class*